**FILED**
WILLIAMSPORT

MAR 1 2 2002

PER ——————————
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE, | : | |
| | : | |
| Plaintiff, | : | Civil Action |
| | : | |
| vs. | : | No. 4:02-CV-0369 |
| | : | |
| PENNSYLVANIA STATE | : | |
| UNIVERSITY, | : | Jury Trial Demanded |
| | : | |
| Defendant. | : | |

## AMENDED COMPLAINT

Plaintiff, by her undersigned attorneys, brings this Complaint against

Defendant and in support thereof states the following:

## INTRODUCTION

1.      Plaintiff Jane Doe, who entered Pennsylvania State University (Penn

State) as a freshman in 1999, brings this action to challenge Penn State's patently

inadequate response to the sexual harassment Jane Doe experienced as a result of

being raped by two male Penn State students in August 1999.  Penn State's actions

constitute deliberate indifference to known, severe, and pervasive sexual

harassment that effectively denied Jane Doe equal access to education in violation

of Title IX of the Education Amendments of 1972.  Penn State's actions also

violated its contractual and fiduciary obligations to Jane Doe.

## JURISDICTION

2.      Jurisdiction is conferred upon this Court by:  (i) 28 U.S.C. §§ 1331,

1343(a)(4), as this is a civil action to redress the deprivation of civil rights secured

by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and (ii)

28 U.S.C. § 1367, as this action includes claims arising under state law that arise

out of the same nucleus of operative facts as the federal claim.

## PARTIES AND VENUE

3.      Plaintiff Jane Doe is a female citizen of the United States who resides

in State College, Pennsylvania.  Because of the privacy interests involved in this

case, Jane Doe has moved this Court for permission to proceed by pseudonym

rather than her real name.  That motion is being filed with this Complaint.

4.     Defendant Pennsylvania State University, an educational institution that receives federal financial assistance, has its main campus in University Park, Pennsylvania.

5.     Venue is proper pursuant to 28 U.S.C. § 1391(b).


## FACTS

6.     Jane Doe started attending Penn State, University Park campus, on scholarships, grants, and financial aid in the summer of 1999.  In her first semester, Jane Doe earned a 4.0 grade point average.

7.     On or about August 21, 1999, while Jane Doe was unconscious, two Penn State students, Nate Parker and Jean Celestin, raped Jane Doe at Parker's off-campus apartment.

8.     Afraid and in physical and mental pain, Jane Doe did not immediately report the incident.

9.     Two and a half weeks after the attack, Jane Doe went to her Penn State academic advisor, Charles Clark, for help, and he advised her to go to the doctor and police.

10.     After seeking counseling and medical treatment from Penn State's Counseling and Psychological Services, Jane Doe reported the rape to the police on or about October 13, 1999.

11.     On or about October 21, 1999, Parker and Celestin were arrested.

12.     On information and belief, the police reported the rape and arrests to Penn State.

13.     On information and belief, Penn State took no action to discipline Parker and Celestin except to "red-shirt" them for the wrestling season while still allowing them to receive their wrestling scholarships and attend classes.

14.     Commencing at the time of Jane Doe's report to the police, Parker and Celestin began an organized campaign to harass Jane Doe and make her fear for her safety.

15.     Parker and Celestin hired a private investigator who showed an enlarged photograph of Jane Doe to students on campus, including to Jane Doe's acquaintances and friends, and sought information about Jane Doe.

16.     The private investigator's actions disclosed to parts of the campus community the identity of Jane Doe, whose rape had been publicized but whose name had, until then, been kept confidential.

17.     After her name was made known to those with whom the investigator talked, Jane Doe was harassed on campus and was no longer able to eat or socialize in public areas.

18.     On October 27, 1999, Parker and Celestin were bound over for trial at a preliminary hearing. That night, Parker appeared in the common area of Jane Doe's dorm, making her fear for her safety.

19.     On or about October 28, 1999, Jane Doe reported the harassment and intimidation to the Penn State campus police.

20.     On or about October 29, 1999, Penn State Judicial Affairs Officer Joseph Puzycki sent a notice of administrative directive to Jane Doe, Parker, and Celestin, stating that there was to be no unsolicited contact, either physical or verbal, direct or indirect, between them or by their friends or acquaintances on their behalf and informing all of them, including Jane Doe, that failure to comply "will result in a charge of failure to comply as well as disciplinary action that may result in separation from the University."

21.     Despite that letter, the harassment of Jane Doe continued. Parker and Celestin constantly appeared outside campus buildings in which Jane Doe had classes. On one occasion, Parker stationed himself outside Jane Doe's dormitory, preventing her from leaving the building out of fear for her safety.

22.     Parker, Celestin, and their friends constantly hurled sexual epithets at Jane Doe while shadowing her as she moved throughout campus and frequently made harassing phone calls to Jane Doe's dorm room. The harassment and intimidation made Jane Doe fear for her general safety on campus.

23.     Also as a result of the harassment, Jane Doe suffered severe depression, sleeplessness, and anxiety attacks.  She was unable to attend classes or even leave her room.

24.     On or about November 8, 1999, Jane Doe sent a statement to Penn State officials extensively detailing the harassment she was experiencing and the fear it caused her and requesting Penn State take action to ensure her safety on campus.

25.     At or about this time, Jane Doe also filed a formal complaint with Penn State's Office of Judicial Affairs.

26.     On November 17, 1999, Jane Doe attempted suicide because of the desperate situation she had been placed in as a result of the harassment.

27.     Following this suicide attempt, Jane Doe, accompanied by Peggy Lorah from Penn State's Center for Women Students, Shirley Bishop from the Centre County Women's Resource Center, and Detective Chris Weaver from the State College Police Department, met with Penn State Office of Judicial Affairs Officer Puzycki to discuss Jane Doe's safety concerns.

28.     Penn State's Policy on Sexual Assault and Abuse in effect at the time of these events stated that it "will not tolerate sexual assault or abuse, such as rape (including acquaintance rape) or other forms of non-consensual sexual activity," that "[t]hese acts degrade the victims, campus community and society in general,"

6

and that "the University strives to create an environment that is free of acts of acts of violence."

29.     Penn State's Guide For Sexual Assault Victims in effect at the time of these events represents that "Judicial Affairs assists in setting standards for student behavior that help maintain a safe university environment."

30.     Penn State's Office of Judicial Affairs Statement on Rights of Victims in effect at the time of these events stated that an immediate suspension would be assigned if there is a "direct threat" to a student.  The Statement also proclaims that the accused may be asked to move to different housing and prohibited from visiting a particular hall or campus.

31.     Despite these written guarantees, Penn State's Judicial Affairs Officer Puzycki, refusing to believe that Jane Doe's safety was at risk or that she was being threatened, took no steps to address Jane Doe's safety needs, refusing not only to expel the rapists but also to take any steps short of expulsion to protect Jane Doe.

32.     Furthermore, although Jane Doe signed confidentiality forms to keep her new address and phone number from being published in the student directory and Penn State committed to honoring her confidentiality, Penn State published the new directory with Jane Doe's new phone number, exposing her to even greater harassment.

33.   On November 23, 1999, Jane Doe again attempted suicide because of the desperate situation she faced.

34.   On November 25, 1999, Jane Doe again wrote a letter to Penn State detailing the horrors she had been through and the need for the University to take steps to stop the harassment she was facing from the attackers and their acquaintances.

35.   Penn State's agents repeatedly ignored Jane Doe's entreaties, telling her only that Parker and Celestin could not be expelled without a judicial hearing and refused to enforce its administrative directive to Parker and Celestin to have no contact with Jane Doe or to address the threats Parker, Celestin, and their friends presented.

36.   Instead of limiting Parker and Celestin's movements, Penn State eventually relocated Jane Doe to an on-campus apartment, but this relocation did not protect her from the harassment.

37.   Through all of the harassment, Jane Doe struggled unsuccessfully to continue attending class and to maintain her 4.0 grade point average.

38.   Finally, because of the constant harassment that Penn State did nothing to remedy, Jane Doe officially withdrew from Penn State in January 2000.

39.   After leaving the area for two months, Jane Doe returned to State College in March 2000.  Upon returning, on or about March 6, 2000, an attorney

then-representing Jane Doe wrote a letter to Penn State informing the University

that Jane Doe had dropped out of school because of the ongoing harassment.  Penn

State never responded to this information about the harassment.

40.     After Jane Doe returned to State College, the harassment resumed:

Jane Doe continued to receive harassing phone calls, and her apartment was broken

into in May 2000 with only her files regarding the attack disturbed.

41.     From March through October 2000, Jane Doe frequently

communicated her concerns about the continuing harassment with Peggy Lorah,

the director of Penn State's Center for Women Students, and State College

Detective Chris Weaver.

42.     On Jane Doe's behalf, both Lorah and Weaver repeatedly informed

Penn State officials of the continuing harassment Jane Doe faced from Parker,

Celestin, and other students at Penn State.

43.     Penn State failed to take any steps to address the harassment.

44.     In October 2000, Penn State permitted Parker and Celestin to resume

full status with the wrestling team.

45.     Because of the continuing harassment, Jane Doe again moved away

from State College in October 2000, but returned in June 2001, still fearing for her

safety.

46.     In October 2001, Parker and Celestin were tried for sexual assault in state court.  Celestin was convicted; Parker was acquitted.

47.     On or about November 19, 2001, the trial judge sentenced Celestin to 6 to 12 months in county prison, even though the mandatory sentence was 3 to 6 years.

48.     On information and belief, the judge departed from the mandatory sentence because of the supporting letters he received on behalf of Celestin from, among others, officials at Penn State.

49.     On information and belief, one of the Penn State officials that wrote a letter praising Celestin was Art Carter, the Assistant Vice President for Student Affairs, whose responsibilities include supervising Judicial Affairs.

50.     Jane Doe desires to complete her education and, under Penn State's policies, is eligible to re-enroll at Penn State; however, because of her continuing fear of harassment on campus and lack of trust in Penn State to protect her from harassment, Jane Doe does not wish to re-enroll at Penn State.

## STATEMENT OF CLAIMS

## FIRST CLAIM FOR RELIEF
## TITLE IX

51.     Plaintiff incorporates by reference paragraphs 1 through 50.

52.     By its conduct described above, Penn State, a federally financed educational institution, remained deliberately indifferent to known sexual

10

harassment within its school, thereby subjecting Jane Doe to discrimination in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 (Tile IX).

53.     The constant harassment Jane Doe faced was sufficiently severe, pervasive, and objectively offensive, and so undermined and detracted from Jane Doe's educational experience, that Jane Doe was effectively denied equal access to educational opportunities, benefits, and/or resources.

54.     Penn State had actual notice of the harassment Jane Doe faced beginning in October 1999 and had actual notice that the harassment continued through and beyond the summer of 2000.

55.     Nate Parker, Jean Celestin, and the other harassers were under Penn State's disciplinary authority at all relevant times.

56.     Penn State's failure to take any action to protect Jane Doe from the harassment that affected her educational opportunities was unreasonable in light of the known circumstances.

57.     Further, the continued favor officials in charge of the disciplinary process showed toward the attackers demonstrates Penn State's actual bias against Jane Doe in the official response to her complaints.

58.     As a result, Penn State's conduct demonstrates deliberate indifference to the known acts of sexual harassment Jane Doe faced.

59.    Penn State, through its actions described above, failed to address, prevent, and remedy sexual harassment in its educational programs and in so doing failed to provide equal access to the educational opportunities and benefits in violation of Title IX and its implementing regulations.  34 C.F.R. § 106.

60.    As a result of Penn State's bias and deliberate indifference, Jane Doe suffered lost educational opportunities and benefits as well as severe emotional distress.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF IMPLIED CONTRACT

61.    Plaintiff incorporates by reference paragraphs 1 through 60.

62.    The written guarantees made by Penn State concerning student safety and discipline constitute an implied contract between Penn State and Jane Doe.

63.    Penn State breached this contract when it failed to respond to Jane Doe's numerous complaints of harassment that resulted in her fearing for her safety.

64.    As a result of this breach, Jane Doe suffered lost educational opportunities and benefits.

## THIRD CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY

65.    Plaintiff incorporates by reference paragraphs 1 through 64.

66.     Because of its relationship with Jane Doe, Penn State stands in a fiduciary relation with Jane Doe and owes her the duty of acting on her behalf and for her protection.

67.     Penn State breached that duty by failing to respond to Jane Doe's numerous complaints of harassment from other Penn State students.

68.     As a result of that breach, Jane Doe suffered lost educational opportunities and benefits as well as severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Jane Doe asks this Court to award the following relief:

(a)     Enter an order declaring that Penn State's actions violated Jane Doe's rights under Title IX and Penn State's contractual and fiduciary obligations.

(b)     Enter an order permanently enjoining Penn State from all unlawful discrimination on the basis of sex, including the failure to address, prevent, and/or remedy sexual harassment, and requiring Penn State to institute and enforce a comprehensive sexual harassment plan and policy that, among other things, sets forth: (1) Penn State's policy prohibiting sexual assault and harassment as well as retaliation and harassment for complaining about sexual assault and harassment, (2) formal and informal complaint procedures available to students who believe they have been victims of sexual assault and harassment, and (3) a complete list of

remedies available to ensure the security of a student faced with sexual assault and harassment.

     (c)    Compensatory damages for Jane Doe's loss of equal access to educational opportunities, resources, and/or benefits and the emotional distress she suffered;

     (d)    Punitive damages;

     (e)    Reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

     (f)    Taxable costs of this action; and

     (g)    Such other relief as this Court may deem proper.

                       Respectfully submitted,

                       *Terry L. Fromson*
                       Terry L. Fromson
                       Carol Tracy
                       Women's Law Project
                       125 S. Ninth St.  Suite 300
                       Philadelphia, PA  19107
                       (215)928-9801
Dated:  March 11, 2002         *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2002, I caused to be served a true and

correct copy of the foregoing Amended Complaint upon the following by Federal

Express Overnight, Postage Prepaid:


Allen Neely
McQuaide, Blasko, Schwartz, Fleming & Faulkner, Inc.
811 University Dr.
State College, PA  16801-6699
*Attorney for Defendant*


Terry L. Fromson
Women's Law Project
125 S. Ninth St.  Suite 300
Philadelphia, PA  19107
(215)928-9801